1  ADLESON, HESS & KELLY, APC
   Randy M. Hess (SBN 88635)
2  Pamela A. Bower (SBN 151701)
   577 Salmar Avenue, Second Floor
3  Campbell, California  95008
   Telephone:   (408) 341-0234
4  Facsimile:    (408) 341-0250
   rhess@ahk-law.com
5  pbower@ahk-law.com

6  Attorneys for Defendant
   MOON MARINE (U.S.A.) CORPORATION
7

8              IN THE UNITED STATES DISTRICT COURT

9            FOR THE NORTHERN DISTRICT OF CALIFORNIA

10                     SAN FRANCISCO DIVISION

11 | GOLDEN EAGLE INSURANCE | Case No.: 3:12-cv-05438-WHA
   | CORPORATION and GENERAL |
12 | INSURANCE COMPANY OF AMERICA, |
   |                                | [PROPOSED] ORDER DENYING MOTION
13 |     Plaintiffs,                | FOR SUMMARY JUDGMENT
14 | vs.                            |
15 |                                |
   | MOON MARINE (U.S.A.) CORPORATION, a |
16 | California Corporation,        |
17 |     Defendant.                 |
18

19
20         IT IS HEREBY ORDERED that the attached jointly redacted version of the Order
21 Denying Motion for Summary Judgment shall be, and hereby is, the Order of this Court.
22         IT IS SO ORDERED.
23
                                        _____
24 Dated:  November 15, 2013.
                                        The Honorable William Alsup
25                                      United States District Court Judge
26
27
28

SEALED BY ORDER OF COURT

ORIGINAL FILED
NOV 8 2013
RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

GOLDEN EAGLE INSURANCE
CORPORATION and GENERAL
INSURANCE COMPANY OF AMERICA,

Plaintiffs,

v.

MOON MARINE (U.S.A.)
CORPORATION, a California
Corporation,

Defendant.

No. C 12-05438 WHA

**ORDER DENYING MOTION FOR SUMMARY JUDGMENT**

## INTRODUCTION

In this action for declaratory relief to determine the extent of coverage, the insurer moves for summary judgment. In as much as issues of material fact still remain, the motion is **DENIED**.

Because this order discloses certain sensitive and privileged information, the complete version of this order shall be filed under seal. The parties shall jointly prepare a public version that is redacted in a manner consistent with the existing protective order designations and privilege rulings in this action and file that version on the public docket by **NOVEMBER 14 AT NOON**.

## STATEMENT

Defendant Moon Marine (USA) Corporation is an importer and distributor of tuna. On April 13, 2012, Moon Marine publicly announced a recall of tuna it had imported into the United States from India (Greenamyre Decl. 2). Following the recall, a number of lawsuits were filed

against Moon Marine for alleged salmonella infections. In all, there were a total of twenty-five known claimants who have asserted claims for damages. General Insurance Company of America ("GICA") has indemnified Moon Marine under its policy for salmonella-related injuries (*ibid.*).

At the time, Moon Marine had a primary commercial general liability policy of insurance issued by GICA effective from August, 15, 2011, to August 15, 2012. The policy had a limit of one million dollars per occurrence and two million dollars aggregate limit (Greenamyre Decl. Exh. A). All twenty-five of the known claimants allege they ingested Moon Marine's imported tuna on a date before Moon Marine announced the recall of its tuna product on April 13. Hence, all of the known claimants' bodily injury claims fall within this one GICA policy period (Greenamyre Decl. 2).

The salmonella related injuries policy defined "occurrence" as:

> 13. "Occurrence" means an accident, including continuous or repeated expose to substantially the same general harmful conditions."

(Greenamyre Decl. Exh. A at 20). The policy further stated:

> 2. The General Aggregate Limit is the most we will pay for the sum of:
>
> a. Medical expenses under Coverage C;
> b. Damages under Coverage A, except damages because of "bodily injury or "property damage" included in the "products-completed operations hazard"; and
>
> 5. Subject to Paragraph 2 . . . above . . ., the Each Occurrence Limit is the most we will pay for the sum of:
>
> a. Damages under Coverage A; and
> b. Medical expenses under Coverage C because of all "bodily injury" and "property damage" arising out of any one "occurrence."

(*id.* at 15–16).

According to the CDC website, "a total of 425 persons" were infected during the outbreak, "with the outbreak strains of Salmonella Bareilly (410 persons) or Salmonella Nchanga (15 persons) reported from 28 states and the District of Columbia" (Greenamyre Decl. 3). The CDC also confirmed that a Seafood Hazard Analysis and Critical Control Point inspection was conducted by the FDA on April 19–24, 2012, at the Moon Fishery Pvt Ltd. processing facility, a separate company from defendant, in Aroor, India. According to the FDA inspection report, multiple possible sources of contamination were found at the facility.

2

The report found:

> Tanks used for storage of process waters have apparent visible debris, filth, and microbiological contamination. Sand and activated carbon filter units used in manufacturing of water are not sanitized, and ventilation for tanks is not filtered to protect against contamination. There is no laboratory analysis for water used in ice manufacturing at the facility to show the water used to make ice is potable. Ice manufacturing lacks sanitary controls: ice manufacturing equipment at the Moon Fishery facility is located outside and is susceptible to adulteration from pests and the environment. Apparent bird feces were observed on the ice manufacturing equipment at Moon Fishery; insects and filth were observed in and on the equipment. Ice manufacturing equipment at your facility is rusty and situated so that the ice can not be protected against adulteration, as the ice manufacturing process is constructed into the flooring of the ice facility. Tuna processed at your facility, which is consumed raw or cooked, comes directly in contact with water and ice.

(Greenamyre Decl. Exh. B). The FDA report also found that Moon Fishery did not monitor the conditions or cleanliness of food contact surfaces. Specifically:

> Some of the floor and wall tiles in the tuna processing area are broken and cracked, not allowing for proper cleaning. After cleaning, the ceiling directly above the in-process tuna line was observed to have visible product residue. After cleaning, product residue and rust were observed on knives and utensil storage boxes. These knives were used to cute raw tuna.

(*ibid.*). In addition, pealing paint was observed directly above the in-process tuna line and no hand drying devices were available in the employee restrooms on the first floor. Based on the FDA report, numerous potential sources of contamination existed, but no single source of contamination was identified as the cause of the outbreak. How the bacteria got into the fish remains unknown (*ibid.*).

[redacted]

In March 2013, the deposition of Moon Marine's President, Wu Chui Ying was taken in one of the underlying actions and has been shared with plaintiff in this action (*ibid.*). No depositions have been noticed or taken in any of the suits filed against Moon Marine of any employees or principals of the production facility in India, from which Moon Marine allegedly purchased the tainted tuna (*ibid.*).

3

On October 22, 2012, GICA brought this action for declaratory relief to determine the extent of coverage it owed Moon Marine. Specifically, GICA argues that the underlying claims for salmonella poisoning were in fact a single occurrence under the insurance policy, and thus limited to the cap of one million dollars (Dkt. No. 1).

On January 22, 2013, the undersigned judge ordered that the action be stayed until almost all of the underlying actions were litigated (Dkt. No. 40). The order stated, "whether or not all of the insured events arise from a single occurrence will depend upon how the bacteria got into the fish in the first place. Possibly, it was a single occurrence, perhaps it was separate, but similar, occurrence[s]. Possibly different batches were involved" (*ibid.*). The order predicted that with the resolution of the underlying claims, it would be easier to determine whether all the injuries arose from a single occurrence.

On September 26, GICA filed this motion for summary judgment, arguing that as a matter of law, all underlying claims resulted from a single occurrence (Dkt. No. 58). Moon Marine filed a motion to file its response under seal so as not to bias remaining claims against it. The motion was granted in part (Dkt. No. 62). On October 23, Moon Marine filed its response and the same day GICA filed its reply (Dkt. No. 64). A hearing was then held.

## ANALYSIS

Summary judgment is proper when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FRCP 56(a). Where the party moving for summary judgment would bear the burden of proof at trial, that party bears the initial burden of producing evidence that would entitle it to a directed verdict if uncontroverted at trial. *See C.A.R. Transp. Brokerage Co. v. Darden Rests., Inc.,* 213 F.3d 474, 480 (9th Cir. 2000).

Plaintiff argues that the resolution of this motion for summary judgment turns upon the proper interpretation of "occurrence" as that term is defined in the insurance policy and applied to the facts of the instant case. "Insurance policies are subject to the general rules of contract construction." *Indus. Indem. Co. v. Aetna Cas. & Sur. Co.,* 465 F.2d 934, 936 (9th Cir. 1972). Accordingly, we must first look to the express language of the policy. *See Flintkote Co. v. Gen. Accident Assurance Co.,* 410 F.Supp.2d 875, 881 (N.D. Cal. 2006) (Judge Marilyn Hall Patel).

4

Disputed terms should be "interpreted in their ordinary and popular sense," unless the parties assign a technical meaning to the terms or, "unless a special meaning is given to them by usage." *Montrose Chem. Corp. v. Admiral Ins. Co.*, 10 Cal.4th 645, 666 (1995). Both parties herein argue that the express language of the insurance policy supports their definition of "occurrence." In addition, the parties have presented ample case law to assist in the analysis.

The policy states that GICA will provide coverage for liability incurred due to "bodily injury" or "property damage" arising out of any one "occurrence" (Greenamyre Decl. Exh. A). An occurrence "means an accident, including continuous or repeated expose to substantially the same general harmful conditions" (*ibid.*). Coverage for breach of an occurrence is capped at $1 million (*ibid.*).

In its response to GICA's motion, Moon Marine articulates two separate theories as to why claimants' underlying injuries were the result of multiple occurrences. *First*, it argues that each claimant's injurious exposure to salmonella was in and of itself a separate occurrence. *Second*, it contends that the underlying cause of the salmonella outbreak remains unknown and a factual dispute remains as to whether there was a single cause or multiple causes that represent independent occurrences. We need only examine the latter argument to decide this motion for summary judgement.

1. **JUDICIAL INTERPRETATIONS OF "OCCURRENCE."**

In the majority of jurisdictions, the number of "occurrences" is determined by the number of proximate causes rather than the number of individual injuries. *See* Couch on Insurance 172:12 (3d ed. 2008). "Such courts consequently hold that where one proximate, uninterrupted, and continuing cause resulted in injuries to more than one person or damage to more than one item of property, there is a single accident or occurrence." *Ibid.* California adheres to the majority rule. *See, e.g., Safeco Ins. Co. of Am. v. Fireman's Fund Ins. Co.*, 148 Cal. App. 4th 620, 633 (2007). In such actions, the result is a finding of only one claim, *i.e.*, the court looks to the single cause rather than to the multiple injuries. *Ibid.* Conversely, when a cause is interrupted, or when there are several autonomous causes, there are multiple "occurrences" for purposes of determining

policy limits and assessing deductibles." *Caldo Oil Co. v. State Water Resources Control Bd.*, 44 Cal. App. 4th 1821, 1828 (1996).

### 2. THE DISTRIBUTION OF SEPARATE CAUSES.

The legal issue presented involves distributors and the proper rule for them. The question is whether under California law, distributors measure the number of occurrences by the number of proximate causes of the harm, or whether their distribution merges all proximate causes into one. GICA argues that Moon Marine's liability in the underlying actions arises from a single cause — its importation and placing into distribution the contaminated tuna from a single supplier in India — triggering the insurance policy's single occurrence limits for liability arising from bodily injury (GICA Br. 12). GICA argues that because the dangerous condition existed in the product prior to the distribution stage, discovery is not required into how the salmonella got into the fish in the first place or whether there were multiple causes of the contamination (*id.* at 2).

In decisions not involving a distributor, the great weight of California legal authority holds that "there must be but one proximate, uninterrupted, and continuing cause which resulted in all of the injuries and damage." *EOTT Energy Corp. v. Storebrand Internat. Ins. Co.*, 45 Cal. App. 4th 565, 576 (1996) (internal citation omitted). In these actions, the determination of the number of occurrences rests firmly on whether there was a single cause of the harm. For example, a landslide that did damage to several properties constituted a single occurrence. *See Safeco Ins. Co. of America*, 148 Cal. App. 4th at 634. On the other hand, where two separate snowfalls caused two separate collapses in the roof of a single building, each storm constituted its own occurrence. *Id.* at 576–77 (citing *Newmont Mines, Ltd. v. Hanover Ins. Co.*, 784 F.2d 127, 135–37 (2d Cir. 1986).

GICA argues for a departure from this rule when applying it to distributors. GICA relies on two decisions, *Chemstar* and *Salmonsen*, for the proposition that a distributor's liability is tied to the distribution rather than the underlying cause or causes of the harm. In *Chemstar, Inc. v. Liberty Mutual Ins. Co*, 41 F.3d 429, 433 (9th Cir. 1994), our court of appeals held that a supplier of lime plaster's liability to 28 third-party claimants arose from a single occurrence — the supplier's failure to warn end-users that the lime was unsuitable for indoor use. The court

6

rejected the lime supplier's argument that the decisions of individual homeowners on where to use the lime constituted individual occurrences. *Id.* at 432.

In the second decision cited by GICA, *Owners Ins. Co. v. Salmonsen*, 366 S.C. 336, 339 (S.C. 2005), the Supreme Court of South Carolina considered whether the distribution of defective stucco that caused water intrusion counted as one occurrence. The Supreme Court held that because the distributor had taken no distinct action giving rise to liability for each sale, the action of placing the product into the stream of commerce constituted a single occurrence.

What *Chemstar* and *Salmonsen* have in common — and what potentially distinguishes them from the present action — is that their third-party claims all arose from the use of a single defective product. In one action it was a lime plaster unsuitable for indoor use and in the other it was defective stucco. There was no possibility of multiple sources. Accordingly, applying liability to the distributors in those actions presented no conflict with the general rule that "there must be but one proximate, uninterrupted, and continuing cause which resulted in all of the injuries and damage." *EOTT*, 45 Cal. App. 4th at 576.

[lines 15–27 redacted]

In order to decide what the occurrence is in this action, we need to trace the accused products back to the original source to determine the nature of the specific defect, recognizing that according to the FDA multiple strains of salmonella might have been at work. This might be accomplished by tracing the defect to multiple batches to see if one particular strain was at fault.

3. **OBJECTIONS TO EVIDENCE.**

Moon Marine objects to the evidence obtained from the CDC website and cited in the Greenamyre declaration on account of it being inadmissible hearsay (Dkt. No. 61). This evidence is admissible, however, under the public records exception of the Federal Rules of Evidence, which states that the record or statement of a public office is admissible if it sets out in a civil case . . . factual findings from a legally authorized investigation. FRE 803(8)(A)(iii).

Moon Marine also objects to two other statements in the Greenamyre declaration ██████████████████████████████████████████████████████████████████████████████ As Ms. Greenamyre has neither personal knowledge, nor established herself as an expert on these matters, this evidence is not admissible in support of plaintiff's motion for summary judgment.

## CONCLUSION

For the reasons stated above, plaintiff's motion for summary judgment is **DENIED**.

**IT IS SO ORDERED.**

Dated: November 7, 2013.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE